**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:24-cv-00048-MR-WCM**

| | |
|---|---|
| **NIGHTINGALE NURSING SERVICES INC.,** ) | |
| ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **MEMORANDUM OF** |
| **vs.** ) | **DECISION AND ORDER** |
| ) | |
| **CAROLINA PINES AT ASHEVILLE, LLC,** ) | |
| ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

**THIS MATTER** is before the Court on the Plaintiff's Motion for Partial Summary Judgment [Doc. 38]; the Defendant's Motion for Summary Judgment [Doc. 40]; and the Defendant's Motion to Strike Exhibit 1 to Second Varughese Affidavit [Doc. 55].

## I.      PROCEDURAL BACKGROUND

This case arises from a dispute between a healthcare staffing company and an owner/operator of a skilled nursing facility over the payment of invoices for services provided at the facility.  The Plaintiff Nightingale Nursing Services Inc. brought this action against the Defendant Carolina Pines at Asheville, LLC, asserting a claim for breach of contract arising from the

Defendant's failure to fully pay invoices submitted by the Plaintiff for the services provided at the Defendant's facility by the Plaintiff's nursing staff. [Doc. 1]. The Plaintiff alternatively asserts a claim for unjust enrichment/quantum meruit in the event that it is determined that there is no valid contract between the parties. [Id.].

The Defendant now moves for summary judgment, arguing that (1) the Plaintiff failed to meet the condition precedent that would have triggered the Defendant's obligation to pay such invoices and (2) the Plaintiff can show no damages for the alleged breach of contract because the Defendant previously overpaid the Plaintiff. [Doc. 40]. Additionally, the Defendant argues that it is entitled to summary judgment on the Plaintiff's unjust enrichment/quantum meruit claim because an express contract exists between the parties. [Id.].

The Plaintiff, in turn, seeks the entry of a partial summary judgment on two discrete issues: (1) that the Defendant may not contest, under any contractual relationship, payment of any charge in the Plaintiff's invoices based on a failure to deduct additional break time beyond 30 minutes for shifts above 5.5 hours, and (2) that the Defendant may not contest, under any contractual relationship, payment of overtime charges due to a lack of express written consent of the facility. [Doc. 38]. Both parties have filed

responses to the respective motions [Docs. 48, 49], as well as replies [Docs. 53, 54]. Accordingly, these matters are ripe for disposition.

## II.   STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "As the Supreme Court has observed, 'this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)) (emphasis in original).

A genuine issue of fact exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party. Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994), cert. denied, 513 U.S. 814 (1994). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat, 346 F.3d at 522. If this showing is made, the burden then shifts to the nonmoving party who

must convince the Court that a triable issue does exist.  Id.  In considering the facts on a motion for summary judgment, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party.  Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

## III.  FACTUAL BACKGROUND

### A.  The Parties

The Plaintiff is a healthcare staffing company organized as a corporation under the laws of the State of North Carolina.  [Doc. 39-1: First Varughese Decl. at ¶ 1].  The Defendant is a North Carolina limited liability company.  [Doc. 9: Answer at ¶ 2].  The Plaintiff provides nursing services to skilled nursing facilities, including Carolina Pines, a skilled nursing facility operated by the Defendant.  [Doc. 39-1: First Varughese Decl. at ¶ 2; Doc. 9: Answer at ¶ 2].

### B.  The Contracts

On June 21, 2022, the parties executed a contract, which on its face governs the payment for nursing staff on a travel assignment.  The Court will hereinafter refer to the parties' June 21, 2022 contract as the "Travel Contract."  [Doc. 43-1: Travel Contract; Doc. 43-3: Friedman Decl. (verifying Travel Contract)].  Two days later, on June 23, 2022, the parties executed a

4

second contract which on its face governs the payment of non-traveling staff. The Court will hereinafter refer to the parties' June 23, 2022 contract as the "Facility Contract." [Doc. 43-2: Facility Contract; Doc. 43-3: Friedman Decl. (verifying Facility Contract)]. Both Contracts provide a series of hourly rates to be paid to various nursing staffers. [Doc. 43-1: Travel Contract at 9; Doc. 43-2: Facility Contract at 8]. The Travel Contract provides hourly rates for "Travel Assignments" that are higher than the "Facility Rates" set forth in the Facility Contract.[1] [Id.]. While the Travel Contract references "travel professional[s]," [Doc. 43-1: Travel Contract at 5 ¶ 2], it does not define what is meant by a "Travel Assignment" or "travel professional," nor does the agreement set forth a list of staffers considered to be "travel professionals." The parties agree that these two Contracts constitute an express agreement between the parties for the payment of the Plaintiff's staff for nursing services rendered at the Defendant's Carolina Pines facility.

Pursuant to these Contracts, the Plaintiff is responsible for (1) providing staffers to work different nursing and nursing assistant roles at the

---

[1] According to the Travel Contract, the agreed base rates for travel assignment staffers are: $60 per hour for CNAs; $70 per hour for medical aides; $80 per hour for LPNs; $85 for supervisors/unit managers; and $90 per hour for RNs, with an additional $22 per hour charged for work performed in any COVID units. [Doc. 43-1: Travel Contract at 9]. According to the Facility Contract, the agreed base rates for facility staffers are: $39 per hour for CNAs; $45 per hour for medical aides; $59 per hour for LPNs; and $69 per hour for RNs, with an additional $17.00 per hour charged for work performed in any COVID units. [Doc. 43-2: Facility Contract at 8].

5

Defendant's skilled nursing facility [Doc. 43-1: Travel Contract at 2 ¶ 1; Doc. 43-2: Facility Contract at 2 ¶ 1]; (2) verifying that all nurse and nurse assistant staffers held the appropriate level of licensure for the role contracted [Doc. 43-1: Travel Contract at 2-3 ¶¶ 3, 5; Doc. 43-2: Facility Contract at 2-3 ¶¶ 3, 4]; (3) maintaining adequate unemployment insurance for all nurse staffers [Doc. 43-1: Travel Contract at 3 ¶ 7; Doc. 43-2: Facility Contract at ¶ 6]; and (4) ensuring all nurse staffers were properly paid for hours verified to have been worked in accordance with the laws and regulations of the United States Department of Labor and the North Carolina Department of Labor [Doc. 43-1: Travel Contract at 3-4 ¶¶ 6, 15; Doc. 43-2: Facility Contract at 3 ¶ 5].

Specifically with respect to time records, the parties' Contracts provide that the Plaintiff is responsible for submitting invoices to the Defendant "setting forth the services performed, the person providing the services, the dates and times worked, the hours of work performed, the hourly rate and the amount due to [the Plaintiff]." [Doc. 43-1: Travel Contract at 3 ¶ 8; Doc. 43-2: Facility Contract at 3 ¶ 7]. The Contracts further provide that the Defendant is responsible for paying the Plaintiff "hourly fees for hours worked by" the Plaintiff's providers. [Doc. 43-1: Travel Contract at 5 ¶ 6; Doc. 43-2: Facility Contract at 5 ¶ 6]. How those hours should be documented varies

between the Contracts.  The Travel Contract provides that such fees shall be "based on the time-records supervised by a representative of the [Defendant] at the completion of the Worker's shift" and that the Plaintiff's travel staff "must comply with the [Defendant's] time-clock regulations."  [Doc. 43-1: Travel Contract at 5 ¶ 6].  The Facility Contract provides, on the other hand, that the fees of the Plaintiff's non-traveling staff shall be "based on the time-record approved by a representative of the [Defendant]."  [Doc. 43-2: Facility Contract at 5 ¶ 6].

Regarding overtime, the Contracts require the Defendant to pay overtime at the rate of 1.5 hours for any hours worked over the 40-hour workweek.  [Doc. 43-1: Travel Contract at 5 ¶ 2; Doc. 43-2: Facility Contract at 5  ¶ 6 (requiring payment of overtime "as regulated by the Board of Labor")].  The Contracts also provide that no personnel may incur overtime "without the express written consent" of the administrator of the Defendant's facility.  [Doc. 43-1: Travel Contract at 5 ¶ 2; Doc. 43-2: Facility Contract at 5 ¶ 6].

The Travel Contract further provides that a "30 minute lunch break will automatically be deducted following 5.5 hours of each shift."  [Doc. 43-1: Travel Contract at 6 ¶ 6].  The Facility Contract does not contain any provision for the deduction of time for breaks.

7

Both Contracts require the Defendant to pay the Plaintiff within 30 days of the submission of an invoice to the facility. [Doc. 43-1: Travel Contract at 5 ¶ 6; Doc. 43-2: Facility Contract at 5 ¶ 6]. Invoices not paid within 30 days are subject to a 1.5% monthly service charge. [Id.].

### C. The Parties' Performance under the Contracts

On July 13, 2022, the Plaintiff sent the Defendant invoice CP-001, in the amount of $13,474.29, and invoice CP-002, in the amount of $73,399.11 for services rendered by the Plaintiff's providers. [Doc. 43-4: CP-001 and CP-002]. These invoices included the following line items: (1) the name of the provider; (2) a clock-in and clock-out time designed to correspond with an attached timesheet from the Plaintiff's timekeeping system; (3) a number of hours worked based on the provider's clock-in and clock-out times; (4) a break deduction of 30 minutes, when applicable; (5) the applicable hourly rate for the provider based on their position and their status as traveling or non-traveling; (6) the provider's position (certified nursing assistant, licensed practical nurse, etc.); and (7) the corresponding amount charged. The Plaintiff based its invoices off entry data from a mobile phone application called "When I Work." The Plaintiff's providers were required to use the app to clock in to and out of their shifts, which they could only do when they were "at or near" a shift location. [Doc. 39-1: First Varughese Decl. at ¶ 6]. It is

8

undisputed that the Plaintiff's invoices were not based on timesheets signed by a Carolina Pines supervisor or on information from the Carolina Pines' internal timekeeping system.[2]  It is further undisputed that the Plaintiff never received written approval from the Defendant before seeking the payment of overtime.  [See Doc. 39-1; First Varughese Decl. at ¶¶ 5, 7].  However, the Defendant was responsible for determining how long a provider's shift would be, and thus the Defendant was aware that overtime would be incurred whenever one of the Plaintiff's providers was scheduled to work more than 40 hours in a week.  [See id. at ¶¶ 4, 5].

With respect to CP-001, the Defendant responded on August 16, 2022, as follows: "cannot approve. no time in system."  [Doc. 43-5: Aug. 16, 2022 Email].  The Defendant thereafter partially paid CP-001, submitting $11,276.83 to the Plaintiff.  [See Doc. 43-11: Chart of Invoices and Amounts Paid].  With respect to CP-002, the Defendant responded on August 16, 2022: "missing punches."  [Doc. 43-6: Aug. 16, 2022 Email].  The Defendant

_____

[2] According to the Plaintiff's CEO, the Plaintiff's practice was to send shift data generated from the When I Work app to the facility prior to submitting an invoice in order to ensure that the facility approved the time entry data.  Once the data was approved, the Plaintiff would then use that data to generate an invoice.  [Doc. 48-1: Second Varughese Decl. at ¶ 4].  If the Plaintiff learned of an issue in the invoice generated or the underlying data, the Plaintiff would then work with the facility to make sure that the correction was reflected on the invoice.  [Id.].

9

submitted a partial payment of CP-002 in the amount of $70,987.63. [See Doc. 43-11: Chart].

From July 2022 through November 2022, the Plaintiff continued to send invoices to the Defendant. [Doc. 43-7: CP-003 through CP-020]. Significantly, invoices CP-003 through CP-020 billed for time in the same manner as CP-001 and CP-002. Invoices CP-003 through CP-020, however, were paid in full and will be referred to collectively as the "Paid Invoices."

The Plaintiff sent the Defendant additional invoices from November 2022 through January 2023. [Doc. 43-10: CP-021 through CP-031]. The Defendant, however, refused to pay these invoices (hereinafter the "Rejected Invoices"). In response to an interrogatory asking for the reasons for non-payment of the Rejected Invoices, the Defendant stated that the Plaintiff had "failed to provide the staff [sic] that was included on various invoices," and that the Plaintiff had "failed to deduct breaks as required, utilized the incorrect rate, wrongfully charged overtime, and previously overcharged Defendant." [Doc. 39-2: Interrog. Responses at 4-5].

10

## IV. DISCUSSION

### A. Defendant's Motion for Summary Judgment

#### 1. Condition Precedent

The Defendant first argues that the Plaintiff's breach of contract claim must fail because the undisputed facts demonstrate that the Plaintiff did not satisfy a condition precedent to payment. Specifically, the Defendant contends that the parties' Contracts required the Plaintiff to calculate its fees based on the Defendant's time records or, at the least, on time records approved by the Defendant. Because the Plaintiff's nursing staff never used the Defendant's timekeeping system or had their time records approved by a Carolina Pines supervisor, the Defendant contends that its obligation to pay the Plaintiff was never triggered.

"A condition precedent is an event which must occur before a contractual right arises, such as the right to immediate performance." Carson v. Grassmann, 182 N.C. App. 521, 524, 642 S.E.2d 537, 539 (2007) (citation omitted). In order to determine whether a condition precedent to payment was satisfied, the Court must examine and construe the terms of the parties' contracts. "Written contracts are to be construed and enforced according to their terms." Galloway as Tr. of Melissa Galloway Snell Living Tr. Dated May 1, 2018 v. Snell, 384 N.C. 285, 287–88, 885 S.E.2d 834, 836

(2023) (citation and internal quotation marks omitted).  "When the language of a contract is clear and unambiguous, effect must be given to its terms, and its terms may not be contradicted by parol or extrinsic evidence."  Id. at 288, 885 S.E.2d at 836 (citations and internal quotation marks omitted).  "A contract which is plain and unambiguous on its face will be interpreted as a matter of law by the court."  Dockery v. Quality Plastic Custom Molding, Inc., 144 N.C. App. 419, 421–22, 547 S.E.2d 850, 852 (2001) (citation omitted).

The Defendant's contention that the Plaintiff's providers was required to utilize the Defendant's own time-keeping system as a *condition precedent* to being paid is not supported by the plain language of the parties' Contracts.  Under the parties' agreements, the Plaintiff was responsible for submitting invoices to the Defendant "setting forth the services performed, the person providing the services, the dates and times worked, the hours of work performed, the hourly rate and the amount due to [the Plaintiff]."  [Doc. 43-1: Travel Contract at 3 ¶ 8; Doc. 43-2: Facility Contract at 3 ¶ 7].  The Contracts in turn provide that the Defendant was responsible for paying the Plaintiff "hourly fees for hours worked by" the Plaintiff's providers.  [Doc. 43-1: Travel Contract at 5 ¶ 6; Doc. 43-2: Facility Contract at 5 ¶ 6].

As for how those hours are to be documented, the Facility Contract provides that the fees of the Plaintiff's non-traveling providers were to be

12

"based on the time-record approved by a representative of the [Defendant]."
[Doc. 43-2: Facility Contract at 5 ¶ 6]. Similarly, the Travel Contract provides
that such fees shall be "based on the time-records supervised by a
representative of the [Defendant] at the completion of the Worker's shift" and
that the Plaintiff's travel providers "must comply with the [Defendant's] time-
clock regulations." [Doc. 43-1: Travel Contract at 5 ¶ 6]. While these
provisions may not be the model of clarity, neither of these provisions
required the Plaintiff's providers to use the Defendant's time-keeping system
in order to be compensated. At most, the Plaintiff's providers had to use a
time-keeping system that "complied" with the Defendant's time-clock
regulations and had to have those time records approved by a representative
of the Defendant. Thus, the Defendant's argument that the Plaintiff's use of
the Defendant's time-keeping system was a condition precedent to payment
is simply without merit.

To the extent that the parties' Contracts required the Plaintiff's
providers to seek approval of their time records from the Defendant, the
Plaintiff has presented a forecast of evidence that it complied with such
requirement. The Plaintiff has forecast evidence that its providers utilized
the "When I Work" app to track their hours worked at the Defendant's facility;
that the Plaintiff presented the time entry data from the When I Work app to

the facility; that it sought approval of such data from the facility; and that it used the When I Work data to generate its invoices. As such, the Plaintiff has submitted a sufficient forecast of evidence from which a reasonable jury could conclude that the Plaintiff submitted invoices in accordance with the terms of the parties' Contracts. The Defendant's motion for summary judgment on the grounds that the Plaintiff breached the parties' agreements in this regard or otherwise failed to satisfy a condition precedent to payment is therefore denied.

### 2. Overpayment

The Defendant next argues that it has no liability to the Plaintiff for further payment under the Contracts because it already overpaid the Plaintiff based on the inclusion of inflated hourly rates and unapproved overtime in the Paid Invoices.

In arguing that the Paid Invoices contained inflated hourly rates, the Defendant asserts that the Plaintiff failed to "obtain consent or illustrate that any individual on its invoices was entitled to be billed at a travel rate or was accepted for a travel assignment." [Doc. 43 at 15]. The Defendant's argument presupposes that the parties' Travel Contract *required* the Plaintiff to obtain such consent or otherwise demonstrate that the individuals

14

identified in its invoices as traveling staff were entitled to be billed at a travel rate. The Travel Contract, however, contains no such requirements.

While referencing "travel professional[s]," [Doc. 43-1: Travel Contract at 5 ¶ 2], the Travel Contract does not define what is meant by a "Travel Assignment" or "travel professional," nor does the agreement set forth a specific list of staffers considered to be "travel professionals." As such, in construing the terms "travel assignment" and "travel professional," the Court applies the plain meaning of such terms. In common parlance, a medical professional on a "travel assignment" is typically an independent contractor who travels to a location and works at a facility or hospital on a temporary basis, often at a higher hourly rate than a non-traveling provider.[3]

The Plaintiff has presented a forecast of evidence that it identified which of its providers were designated as travel professionals (and thus were entitled to travel rates) in the invoices it submitted to the Defendant for payment. The Plaintiff has also presented a forecast of evidence that the Defendant paid the first twenty invoices submitted by the Plaintiff without challenging these designations.[4] As such, the Plaintiff has presented

---

[3] The Court notes that this situation was exceedingly common during the COVID-19 pandemic due to nationwide nursing shortages.

[4] The Plaintiff also has presented a forecast of evidence consisting of emails between the Plaintiff and Kim Sawyer, a former employee of the Defendant who worked as the scheduler at the Defendant's facility. These emails purportedly contained copies of

15

evidence from which a jury could reasonably conclude that the providers who were entitled to the travel rates set forth in the parties' Travel Contract were appropriately identified by the Plaintiff and that such designations were communicated to, and accepted by, the Defendant. Because genuine issues of fact remain as to the appropriateness of the hourly rates utilized in the invoices, the Defendant's motion for summary judgment is denied in this regard.

As for overtime, the parties' Contracts unambiguously provide that no personnel may incur overtime "without the express written consent" of the administrator of the Defendant's facility. [Doc. 43-1: Travel Contract at 5 ¶ 2; Doc. 43-2: Facility Contract at 5 ¶ 6]. The Plaintiff admittedly never sought or received formal written approval from the Defendant for overtime. [See Doc. 39-1: First Varughese Decl. at ¶¶ 5, 7]. However, the Plaintiff has presented a forecast of evidence from which a jury could reasonably conclude that the Defendant waived the requirement of written approval. North Carolina law has long recognized that "[t]he provisions of a written

_____

contracts and other records identifying 28 different staffing professionals as being on travel assignments at Carolina Pines. [Doc. 48-2: Second Varughese Decl., Ex. 1]. The Defendant has moved to strike these records as having been untimely disclosed, claiming that such records were sent to Ms. Sawyer's private email address and thus the Defendant was not aware of the existence of such documents prior to the Plaintiff's belated disclosure. [Doc. 55]. The Court need not address this motion, however, as the Court has not relied upon such evidence in ruling on the parties' motions for summary judgment. As such, the Defendant's Motion to Strike will be denied as moot.

contract may be modified or waived by a subsequent parol agreement, or by conduct which naturally and justly leads the other party to believe the provisions of the contract are modified or waived." 42 East, LLC v. D.R. Horton, Inc., 218 N.C. App. 503, 511, 722 S.E.2d 1, 6–7 (2012) (quoting Whitehurst v. FCX Fruit & Vegetable Serv., Inc., 224 N.C. 628, 636, 32 S.E.2d 34, 39 (1944)).  Whether the parties' course of conduct amounted to a waiver is a question of fact.  42 East, LLC, 218 N.C. App. at 512, 722 S.E.2d at 7.

Here, the parties' course of dealing demonstrates that the Defendant was responsible for determining how long a provider's shift would be, and thus the Defendant was aware that overtime would be incurred whenever one of the Plaintiff's providers was scheduled for more than 40 hours in a week.  Additionally, the Plaintiff has presented a forecast of evidence, through the declaration of its CEO, that its practice was to send shift data generated from the When I Work app, including claims of overtime, to the facility for approval prior to submitting an invoice.  The parties' course of dealing further demonstrates that the Plaintiff submitted eighteen invoices which contained claims of overtime and that these invoices were paid in full without any written approval issuing from the Defendant.  Based on this forecast of evidence, a jury could reasonably conclude that the Plaintiff substantially compiled with the Contracts' requirements to have overtime

approved or that the Defendant waived the written-approval requirement through its course of conduct. Accordingly, the Defendant's motion for summary judgment on the grounds that the Plaintiff failed to seek written approval before claiming overtime hours is denied.

### 3. Unjust Enrichment/Quantum Meruit Claim

The Defendant also seeks dismissal of the Plaintiff's unjust enrichment/quantum meruit claim on the grounds that an express contract exists between the parties. If, however, the jury agrees with the Defendant that the Plaintiff breached the terms of the Contracts by failing to properly submit invoices, the Plaintiff may still have a viable unjust enrichment claim for the work performed by its providers for which the Plaintiff has not been compensated. As such, the Defendant's motion for summary judgment with respect to the Plaintiff's unjust enrichment/quantum meruit claim is denied.

### B. Plaintiff's Motion for Partial Summary Judgment

The Plaintiff seeks a judgment as a matter of law on two discrete issues: (1) that the Defendant may not contest, under any contractual relationship, payment of any charge in the Plaintiff's invoices based on a failure to deduct additional break time beyond 30 minutes for shifts above 5.5 hours, and (2) that the Defendant may not contest, under any contractual

18

relationship, payment of overtime charges due to a lack of express written consent of the facility.[5]

With respect to the issue of overtime, the Court already has determined that the parties' Contracts unambiguously require written approval of overtime hours but that genuine disputes of fact remain as to whether the Plaintiff complied with this requirement or whether the Defendant waived this requirement. Thus, the Plaintiff's Motion for Partial Summary Judgment on the issue of overtime compensation is therefore denied.

With respect to the deduction of break times, the Travel Contract provides that a "30 minute lunch break will automatically be deducted following 5.5 hours of *each shift*." [Doc. 43-1: Travel Contract at 6 ¶ 6 (emphasis added)].[6] This language unambiguously requires a deduction of 30 minutes for each shift that is in excess of 5.5 hours. The parties, however,

_____

[5] The Defendant contends that the Plaintiff's motion is inappropriate under Rule 56, arguing that the Plaintiff is merely seeking to prevent the Defendant from making certain arguments at trial or from taking certain positions in litigation. While the Plaintiff's motion is somewhat unusual in its scope, the relief sought is not prohibited under Rule 56, which permits summary judgment on a "part of [a] claim or defense." Fed. R. Civ. P. 56(a). This would include resolution of issues of contract interpretation. See, e.g., HSK v. UnumProvident Corp., No. CCB-12-3373, 2013 WL 5310204, at *6 (D. Md. Sept. 19, 2013) (granting motion for partial summary judgment on issues of contract interpretation). Thus, to the extent that the discrete issues identified concern interpretation of the parties' agreements and would resolve part of the Plaintiff's breach of contract claim, the Court will endeavor to address such issues here.

[6] The Facility Contract does not contain any provision regarding deductions for break times.

differ on the meaning of the term "shift," which is not further defined in the contract.  By way of example, the parties disagree as to whether an invoice reflecting a nurse working at the facility continuously for sixteen hours constitutes one or two shifts. The Plaintiff's position is that this nurse has worked *one* continuous 16-hour shift, for which *one* 30-minute break would be deducted. The Defendant contends, on the other hand, that the nurse has worked two separate shifts, consisting of two separate 8-hour shifts, for which two 30-minute breaks would be deducted. In essence, the parties disagree if the nurse worked one continuous shift or two consecutive shifts. The parties, however, fail to present a sufficient forecast of evidence for their respective positions.[7]  Without a proper forecast of evidence before it, the Court cannot determine as a matter of law whether the proper number of break times were deducted from the Plaintiff's invoices in accordance with the Travel Contract.  Accordingly, the Plaintiff's motion for partial summary judgment on the issue of deductions for break times is also denied.

---

[7] The invoices provide no further clarity. For instance, using the 16-hour example above, a nurse may have been scheduled for one continuous 12-hour shift and 'picked-up' another 4-hour shift that same day, in which case, only one 30-minute deduction would apply under either of the parties' positions.  Without sufficient evidence to clarify how the Defendant scheduled these shifts, there is nothing by which the Court can use to sort through the myriad possible scenarios and conclude as a matter of law that additional break times should have been deducted in accordance with the Travel Contract.

## V. CONCLUSION

In summary, the Defendant's Motion for Summary Judgment is denied; the Plaintiff's Motion for Partial Summary Judgment is denied; and the Defendant's Motion to Strike Exhibit 1 to the Second Varughese Declaration is denied as moot.

## O R D E R

**IT IS, THEREFORE, ORDERED** that:

(1)  The Plaintiff's Motion for Partial Summary Judgment [Doc. 38] is **DENIED**;

(2)  The Defendant's Motion for Summary Judgment [Doc. 40] is **DENIED**; and

(3)  The Defendant's Motion to Strike Exhibit 1 to Second Varughese Affidavit [Doc. 55] is **DENIED AS MOOT**.

**IT IS SO ORDERED.** Signed: July 29, 2025

Martin Reidinger
Chief United States District Judge